**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | |
|---|---|
| SHARKY'S SPORTS BAR, ET AL.<br><br>PLAINTIFFS,<br><br>V.<br><br>VILLAGE OF MOUNT MORRIS, ILLINOIS, ET AL.<br><br>DEFENDANTS. | CASE NO.: 24-CV-50457<br><br>JUDGE IAIN D. JOHNSTON |

## MEMORANDUM OPINION AND ORDER

After a fire destroyed Sharky's Sports Bar in Mount Morris, Illinois, emotions and tensions ran high—all the way to federal court. The latest development in the saga involves text messages. Plaintiffs Sharky's Sports Bar Corp., Double Duce Corp., and Pamela and Steven Rossi (Sharky's) allege that Defendants Village of Mount Morris (the Village), Mount Morris President Phil Labash, and Mount Morris Police Chief Michael Cicchetti, alongside their legal counsel, failed to implement a litigation hold with respect to text messages stored on personal cell phones. Sharky's now moves for remedial measures and sanctions under Rule 37(e). Dkt. 284. Because Sharky's has failed to establish that any relevant ESI existed and was destroyed, the motion is denied.

**Background**[1]

On April 16, 2024, a fire engulfed the premises at 1 N. Wesley St., Mount Morris, Illinois, owned at the time by defendants Heather and Brock Swanlund and leased to defendant Justin Coltrain. The fire destroyed the property, including Sharky's Sports Bar, which shared a wall with 1 N. Wesley. This action was subsequently filed in November 2024, alleging a litany of wrongdoing by the Village, its agents, the Swanlunds, Coltrain, and others. Fact discovery has been ongoing since March 2025 under a case management order. Dkt. 71. Originally scheduled to close in December 2025, fact discovery has been extended several times and was scheduled to end on July 26, 2026. Dkts. 221, 275, 289, 291, 305. No good cause exists for extending discovery.

In response to Sharky's first set of requests for production of documents in May 2025, the Village produced two text message exchanges between Chief Cicchetti and President Labash that occurred shortly after the fire. Motion for Sanctions ex. A [284-1]. The first text exchange details the police department's attempts to locate Coltrain following the fire; the second informs Cicchetti that a chain link fence and signs were being erected around the burnt property. *Id.* These, when combined with statements made in Labash's and Cicchetti's depositions, lead Sharky's to believe that more text

[1] The Court need not regurgitate every twist and turn of this story to reach a resolution to this motion. Only pertinent background is provided. What matters for today is largely uncontested.

messages related to the fire—or to Coltrain's conduct leading up to the fire—must exist.[2]

Four months later— September 2025—a third set of requests for production was served on Cicchetti.[3] It requested production of "all communications and documents, including text messages, reflecting any communications between [y]ou or [y]our agents with any Defendants in this case or witnesses listed in the Mt. Morris Police Report Case number MMPD24-01444 from September 2022 to the present relating to any ordinance violations at 1 N. Wesley St., Mt. Morris, Illinois, Sharky's Sports Bar, or the fire that occurred on April 16, 2024." *Id.* at ex. D [284-4]. No text messages were provided in response. A deficiency letter was then sent in October 2025, referencing four contacts contained in police activity logs between Coltrain and Village police. *Id.* at ex. B [284-2]. Specifically, the letter notes that Officer White "contacted [Coltrain] via text" in November 2022, that Officer Sutter "[m]ade contact with Justin [Coltrain] via text" in January 2023, and that Coltrain contacted Officer Rogers "via phone" on two occasions, once regarding a no-trespass order and once when Coltrain reported a fight at Sharky's, in January 2024 and February 2024, respectively. *Id.* All of these contacts pre-date the April 2024 fire, some by well over a year. In response, Defendants confirmed the lack of existence of text or call logs from any of the involved officers, including Cicchetti himself, Rogers, Sutter, or White. *Id.* at ex. C [284-3].

[2] Plaintiffs also note that Officer Cassie Rogers testified in her February 2026 deposition that she would communicate with Coltrain through either text or phone calls. She testified that messages delete automatically from her device and that she was not instructed to disable that feature.
[3] The second set of requests for production is not referenced in Sharky's motion.

Plaintiffs submitted a second deficiency letter, which led to a meet-and-confer. *Id.* at ex. D [284-4]. At the meet-and-confer in December 2025, Defendants' attorneys reported that the auto-delete function on Defendants' cell phones had *never* been disabled. By February 2026, Defendants provided Plaintiffs a letter stating that counsel had personally examined the cell phones and obtained affidavits from the involved officers indicating that "no record of any communication by text or cell phone pertaining to Coltrain or the fire" was present on any of their phones.[4] *Id.* at ex. E [284-5].

In March 2026, Plaintiffs responded with yet another letter, demanding production of the forementioned affidavits, information regarding the litigation hold that was placed during the litigation, identification of the devices and cellular providers in question, identification of the retention and auto-delete settings on the phones, the search methodology used by counsel in its investigation, and confirmation of forensic preservation in the phones' current state. *Id.* at ex. F [284-6]. It also sought agreement to a neutral forensic examination of the devices and requested another meet-and-confer. *Id.* Defendants responded arguing that Plaintiffs' requests amounted to the seemingly obligatory claim of "discovery on discovery." *Id.* at ex. G [284-7].

After a meet-and-confer was unsuccessful, Sharky's filed a motion for sanctions seeking relief under Fed. R. Civ. P. 37(e)(1), 37(e)(2), and 26(g). It specifically seeks

[4] The letter also explains that the Village doesn't provide its employees with cell phones but instead provides its full-time employees and administrators a monthly stipend for the use of their personal devices for Village business.

the ability to present evidence to the jury regarding the autodeletion, the "likely relevance of the lost ESI," an instruction that the jury may consider this information when making its decision, an instruction that the jury can presume the information deleted was unfavorable, and payment of expenses including attorneys' fees caused by the alleged violations. Defendants deny any discovery violation or that remedial measures or sanctions are appropriate. Moreover, Defendants move for attorneys' fees of their own incurred in responding to this motion.

Finally, in May 2026, a fourth set of requests for documents from Sharky's requested "all documents, communications, emails, text messages, demand letters, notices, complaints, investigative materials, recordings, and lawsuits relating to allegations by Defendant Justin Coltrain that property was removed or stolen from the fire debris following the April 16, 2024 fire." Motion to Supplement [308]. Defendants' response yielded a brief text exchange between Chief Cicchetti and an unknown sender.[5] *Id.* at ex. A. The Court granted Sharky's leave to supplement its motion for sanctions with this new material. Dkt. 309.

**Legal Standards**

Once a party reasonably anticipates litigation, it is duty-bound to take reasonable and good faith steps to preserve documents and data that may be relevant to the litigation. *DR Distribs., LLC v. 21st Century Smoking, Inc.*, 513 F.Supp.3d 839, 929 (N.D. Ill. 2021). Rule 37(e) governs the "failure to preserve electronically stored

---

[5] Sharky's refers to this individual as "someone from the Village of Mt. Morris." Motion to Supplement [308] at pg. 2. It's unclear from where it draws this inference, except that the Defendants produced the text messages. The text messages are being sent to "Mike" with the initials "MC" (presumably Chief Michael Cicchetti). But the individual whose screen is captured is unknown and undetailed.

information." *Id.* at 958; Fed. R. Civ. P. 37(e). In addressing such a motion, five threshold requirements must be met: (1) the information must be ESI; (2) there must have been anticipated or actual litigation that triggers the duty to preserve ESI; (3) the relevant ESI should have been preserved at the time the litigation was anticipated or ongoing; (4) the ESI must have been lost because a party failed to take reasonable steps to preserve it; and (5) the lost ESI cannot be restored or replaced through additional discovery. *Id.* Only if all five of these requirements are met are curative measures available under the Rule, provided the non-spoliating party has been prejudiced. *Id.* Sanctions—as opposed to curative measures—are available when these five requirements exist *and* a party is found to have acted with the intent to deprive another party of the information's use in the litigation. Fed. R. Civ. P. 37(e)(2). Separately but relatedly, counsel who improperly certify discovery disclosures may be subject to independent monetary sanctions. Fed. R. Civ. P. 26(g)(3).

Critically, the analysis surrounding a failure to preserve ESI assumes a prerequisite: that the ESI at question existed in the first place. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 292 (3d Cir. 2018); *White v. Powell*, No. 21-cv-50094, 2026 U.S. Dist. LEXIS 88583, at *12 (N.D. Ill. April 22, 2026). Indeed, this is the most rudimentary requirement. *Gomez v. Stop & Shope Supermarket Co.*, 670 F.3d 395, 399 (1st Cir. 2012). "For spoliation 'sanctions to be appropriate, it is a necessary, but insufficient, condition that the sought-after evidence actually existed and was destroyed.'" *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litigation*,

341 F.R.D. 474, 493 (S.D.N.Y. 2022) (quoting *Farella v. City of New York*, Nos. 05 Civ. 5711 & 05 Civ. 8264 (NRB), 2007 U.S. Dist. LEXIS 7420, at *2 (S.D.N.Y. Jan. 25, 2007)). And "speculative assertions as to the existence of [evidence] do[es] not suffice to sustain a motion for spoilation of evidence." *Tri-County Motors, Inc. v. Am. Suzuki Motor Corp.*, 494 F.Supp.2d 161, 177 (E.D.N.Y. 2007).

Proof of a negative isn't easy. As Magistrate Judge Paul Cleary noted, "it is difficult to prove [evidence] existed but has been destroyed; however, frequently a missing [piece of evidence] will be referred to in other surviving documents or will be recalled during deposition." *Pinstripe, Inc. v. Manpower, Inc.*, No. 07-CV-620-GKF-PJC, 2009 U.S. Dist. LEXIS 66422, at *11 (N.D. Okla. July 28, 2009). This threshold nonetheless must be met by the moving party—as is the default in all civil litigation—by a preponderance of the evidence. *E.M.D. Sales, Inc. v. Carrera*, 604 U.S. 45, 47 (2025). The preponderance of the evidence standard isn't onerous, but it's also not insignificant. *Jetel v. Jetel*, No. 25-cv-50329, 2025 U.S. Dist. LEXIS 215011, at *10 n.4 (N.D.Ill. Oct. 31, 2025).

So, the prerequisite issue is whether there is evidence—direct or circumstantial—that allows a court to draw a reasonable inference that the ESI existed. That sentence may seem simple, but there's a lot to unpack.

First, there's the issue of evidence, which the court evaluates—including weighing and deciding credibility—in determining preliminary Rule 37(e) issues, including this one. *Henry v. Mihm*, No. 22-cv-12830, 2026 U.S. Dist. LEXIS 45670, at *6-11 (E.D. Mich. Mar. 5, 2026); *Fuhs v. McLachlan Drilling Co.*, No. 16-376, 2018

U.S. Dist. LEXIS 184264, at *42 (W.D. Pa. Oct. 26, 2018). Rule 37(e) issues, especially intent, are rarely proved through direct evidence, but instead often rely upon circumstantial evidence. *Cox Autos., Inc. v. Super Dispatch Inc.*, No. 24-cv-292, 2025 U.S. Dist. LEXIS 222094, at *9-10 (W.D. Mo. Nov. 11, 2025); *Blazer v. Gall*, No. 16-CV-1046, 2019 U.S. Dist. LEXIS 128629, at *14-15 (D.S.D. Aug. 1, 2019). There's nothing wrong with using circumstantial evidence. *Hollis v. Ceva Logistics U.S., Inc.*, 603 F. Supp. 3d 611, 623 (N.D. Ill. 2022). And inferences can be drawn from circumstantial evidence. *United States v. Marrinson*, 832 F.2d 1465, 1475 (7th Cir. 1987). Indeed, juries are routinely instructed on both points. Pattern Civil Instruction 1.11 ("In our lives, we often look at one fact and conclude from it another fact exists. In law, we call this 'inference.' A jury is allowed to make reasonable inferences. Any inference you make must be reasonable and must be based on the evidence in the case."); Pattern Civil Instruction 1.12, ("The law makes no distinction between the weight to be given to either direct or circumstantial evidence.") Federal Civil Jury Instructions of the Seventh Circuit (2017). Regardless of whether the evidence is direct or circumstantial, *evidence* must exist to allow a court to draw an inference. *United States v. Article of Device*, 731 F.2d 1253, 1263 (7th Cir. 1984); *Altana, Inc. v. Abbott Labs.*, No. 04 C 4807, 2007 U.S. Dist. LEXIS 66232, at *14-15 (N.D. Ill. Sept. 7, 2007) ("But without evidence of such an increase, the jury could speculate that Altana incurred such increased costs, but a jury could not reasonably infer that Altana incurred them."). After all, evidence is the premise from which the

inference is drawn. *See Gomez v. Stop & Shop Supermarket Co.*, 670 F.3d 395, 399 (1st Cir. 2012); *see also United States v. Johnson*, 4 F.4th 116, 123 (D.C. Cir. 2021).

Second, there's what the court is allowed to do, which is to draw reasonable inferences, not speculate. *State v. Bivins*, 83 P.3d 379, 383 (Ore. App. Ct. 2004) ("Reasonable inferences are permissible; speculation and guesswork are not."). An inference is different from speculation. *Senner v. Northcentral Tech. College*, 113 F.3d 750, 757 (7th Cir. 1997). Sometimes, the difference might be wafer-thin, but there's still an important difference. *United States v. Jones*, 713 F.3d 336, 346-47 (7th Cir. 2013); *Doe v. DeKalb Cmty. Unit Dist. 428*, No. 23-cv-50292, 2024 U.S. Dist. LEXIS 206006, at *13-14 (N.D. Ill. Nov. 13, 2024); *see Bivins*, 83 P.3d at 383. Context matters in determining whether a reasonable inference exists. *United States v. Waldemer*, 50 F.3d 1379, 1384 (7th Cir. 1995) ("The term 'reasonable inference' must be defined contextually."). So, those two processes need to be defined and distinguished. And, within that process, a court must focus on what's "reasonable."

One way of distinguishing between drawing inferences and speculating is to simply look at the dictionary definitions of the terms. An "inference" is "[a] conclusion reached by considering other facts and deducing a logical consequence from them." *Inference*, Black's Law Dictionary (12th ed. 2024). In contrast, "speculation" is "[t]he practice or an instance of theorizing about matters over which there is no certain knowledge." *Speculation*, Black's Law Dictionary (12th ed. 2024). The former is what scientists are supposed to do, and the latter is what radio personalities and their guests do on sports call-in shows.

Another way to differentiate between inference and speculation is to analyze how courts compare the two concepts.

An inference—as opposed to speculation—is based on logic. *Bivins*, 83 P.2d at 383 (*citing Tose v. First Pennsylvania Bank, N.A.*, 648 F.2d 879, 895 (3d Cir. 1981)). The inferential conclusion flows from the proven facts in a logical sequence. *Id.* A reasonable inference requires a logical and proximate connection from the evidence to the fact sought to be inferred. *United States v. Waldemer*, 50 F.3d 1379, 1384 (7th Cir. 1995). A reasonable inference requires the existence of another fact or facts to allow a logical conclusion that another fact is true. *United States v. Article of Device*, 731 F.2d 1253, 1263 (7th Cir. 1984). This logical connection is based on a chain of cause and effect and common experience. *Taylor v. Richardson*, 321 F. Supp. 636, 638 (E.D. Ten. 1970).

A court considers the weight of the evidence as part of the calculus to allow it to reasonably infer a fact. *Wisconsin Memorial Park Co. v. C.I.R.*, 255 F.2d 751, 753 (7th Cir. 1958) ("The difference between speculation and inference lies in the substantiality of the evidence constituting the premise."). In other words, the weightier the evidence the more likely an inference—rather than speculation—is occurring. The evidentiary weight is not determinative but can be considered. For example, a factfinder could reasonably infer that an event happened in the morning if a witness testified that at the time she saw long shadows cast in a westerly direction. It's difficult to imagine weightier evidence than the sun rising in the east.

In contrast, speculation is a hunch, intuition, and flight of fancy. *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003). Stated differently, speculation is guesswork. *Bivins*, 83 P.3d at 383. Speculation is akin to conjecture or mere assumptions. *Doe v. Backpage.com*, 817 F.3d 12, 25 (1st Cir. 2016); *Gomez v. Stop & Shop Supermarket Co.*, 670 F.3d 395, 398 (1st Cir. 2012). In the Seventh Circuit—and Illinois—inferences can't be based on conjecture. *King v. Hendricks Cty.*, 954 F.3d 981, 984 (7th Cir. 2020); *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004); *Gyllin v. College Craft Enters., Ltd.*, 633 N.E.2d 111, 117 (Ill. App. Ct. 1994).[6] Likewise, inferences can't be premised on suspicion. *McCarty v. Hillstone Rest. Grp., Inc.*, 864 F.3d 354, 359 (5th Cir. 2017).

Although seemingly already incorporated into the concept of inference, factfinders may only draw reasonable inferences from evidence. At the risk of embarking onto a dangerous sea[7] and fully recognizing that it is an important word, *see Kyles v. Whitley*, 514 U.S. 419, 434 (1995), "reasonable" in this context contains at least two components: (1) an occurrence aspect, and (2) a normative aspect. In analyzing the occurrence aspect, ranking the occurrence's chance of existence might be helpful. At the bottom of the pile is "possible." Almost anything is possible. *See Lacon v. Educ. Principle Found.*, No. 21-cv-3957, 2022 U.S. Dist. LEXIS 110160, at *1-2 (E.D. Pa. Jun. 22, 2022). Above "possible" is "plausible." *Ashcroft v. Iqbal*, 556

[6] Based on its understanding of the term "conjecture," the Eleventh Circuit possesses case law asserting that reasonable inferences may be based on conjecture. *See, e.g., Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1326 (11th Cir. 1982). But this Court does not think that word means what the Eleventh Circuit thinks it means. *See Conjecture*, Black's Law Dictionary (12th ed. 2024) (defining "conjecture" as "[a] guess, supposition; surmise.").

[7] *See Reasonable Doubt*, Black's Law Dictionary (12th ed. 2024) (quoting Glanville Williams, *Criminal Law: The General Part* 873 (2d ed. 1961).)

U.S. 662, 678 (2009); *Bell At'l Corp. v. Twombly*, 550 U.S. 544, 557 (2007). A "possible" or "plausible" inference is insufficient for a factfinder to draw an inference.[8] "Plausible" is merely a "nonnegligible probability." *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010). Toward the top of the heap are "likely" and "probable," which are higher than possible. *Ferguson v. Sec'y for the Dep't of Corr.*, 580 F.3d 1183, 1198-99 (11th Cir. 2009). In this hierarchy, tucked between "plausible," which is insufficient, and "likely" and "probable," which are too demanding, is "reasonable." Both "likely" and "probable" are higher than "reasonable." *Dekeyzer v. Harry*, 603 F. App'x 399, 404 (6th Cir. 2015) (likely higher than reasonable); *In re Application of United States for Taxpayer Return Info.*, 204 F. Supp. 3d 933, 938 (E.D. Ket. 2016) ("probable" more stringent than "reasonable"). And "reasonable" is more demanding than "plausible." As to the normative aspect, as discussed already, "reasonable" requires a logical and proximate connection between the evidence and the inference sought to be drawn. *United States v. Ward*, 211 F.3d 356, 365 (7th Cir. 2000).

The abstract articulation of these concepts likely benefits from examples, an analogy, and a classic cartoon.

Here are two examples. The first example was articulated by the Texas Court of Criminal Appeals:

> A woman is seen standing in an office holding a smoking gun. There is a body with a gunshot wound on the floor near her. Based on these two facts, it is reasonable to infer that the woman shot the gun (she is holding the gun, and it is still smoking). Is it also reasonable to infer that she shot the person on the floor? To make that determination, other factors must be taken into

[8] Courts are not "factfinders" when deciding Rule 12(b)(6) or Rule 12(c) motions.

> consideration. If she is the only person in the room with a smoking gun, then it is reasonable to infer that she shot the person on the floor. But, if there are other people with smoking guns in the room, absent other evidence of her guilt, it is not reasonable to infer that she was the shooter. No rational juror should find beyond a reasonable doubt that she was the shooter, rather than any of the other people with smoking guns. To do so would require impermissible speculation. But, what if there is also evidence that the other guns in the room are toy guns and cannot shoot bullets? Then, it would be reasonable to infer that no one with a toy gun was the shooter. It would also be reasonable to infer that the woman holding the smoking gun was the shooter. This would require multiple inferences based upon the same set of facts, but they are reasonable inferences when looking at the evidence. We first have to infer that she shot the gun. This is a reasonable inference because she is holding the gun, and it is still smoking. Next, we have to infer that she shot the person on the floor. This inference is based in part on the original inference that she shot the gun, but is also a reasonable inference from the circumstances.

*Hooper v. State*, 214 S.W.3d 9, 17 (Tx. Ct. Crim. App. 2007).[9]

This next example is from a class taught by an excellent adjunct professor. In this scenario, the plaintiff is an Irish Catholic woman who filed in the Northern District of Illinois, Eastern Division, a Title VII action alleging disparate treatment claims based on national origin and religion discrimination. The employer's decision maker claims he didn't know her national origin and religion, which is a perfectly good defense as it defeats causation. *Larsen v. Sensient Flavors LLC*, No. 24-cv-50339, 2025 U.S. Dist. LEXIS 221134, at *10 (N.D. Ill. Nov. 10, 2025) ("An employer can't discriminate against an employee because of a protected class if it didn't know the employee was in the protected class.") *citing Stagman v. Ryan*, 176 F.3d 986, 999-1000 (7th Cir. 1999). Without more, concluding discrimination occurred is speculation. But let's add the fact that the plaintiff's name is "Katherine O'Malley." That's a fact but is it a reasonable inference from this additional fact that the decision

[9] Film buffs might recall that in *Bodies Bodies Bodies*, Jordan, Alice, Sophie, Emma, and Bee immediately speculated that David was murdered. Spoiler alert: He wasn't.

maker knew the plaintiff's national origin and religion? Perhaps more so as to national origin than religion. There's likely a stronger logical connection based on this fact to national origin than religion. But the fact of the name alone wouldn't allow for a reasonable inference that the decision maker knew the plaintiff was Irish and Catholic. So, let's add some more facts. At all times, the plaintiff wore a crucifix and a claddagh ring. Can logical reasoning now be used to infer that the decision maker knew that the plaintiff was both Irish and Catholic? Without more, it's certainly plausible. But is it reasonable? That's the real question. It's probably reasonable. But what if the decision maker was new to Chicago and never heard of the Old St. Pat's Church or was even familiar with dyeing the Chicago River green? (In this hypothetical, geography matters. *See* Proposed Amendment to Federal Rule of Evidence 104(a) (recognizing that common knowledge of people in the community is relevant to relevance))[10] Do those facts negate the logical reasoning that can be drawn from the other facts? Those facts support the decision maker's claimed ignorance, for sure. So, those facts need to be considered. Could a reasonable inference still be drawn? Maybe, but likely less so. Now add the fact that to obtain personal time off, each year for the last five years, the plaintiff was required to and did, in fact, ask the decision maker for leave on Good Friday and St. Patrick's Day. At this point, the reasonable inference is that the decision maker knew the plaintiff was not only Catholic but also Irish, despite the claimed lack of knowledge.

[10] https://www.uscourts.gov/sites/default/files/document/2026-06-standing-committee-meeting-agenda-book.pdf

In *Haynes v. Alumax Recycling Group, Inc.*, the late, great Judge Milton I. Shadur used a connect-the-dots analogy to illustrate the difference between reasonable inferences and speculation. 719 F. Supp. 707, 713 (N.D. Ill. 1989). In *Haynes*, Judge Shadur noted that "it is possible to devise almost any story post hoc to mix facts with total fancy." *Id*. This is what flat-earthers, moon-landing deniers, and their ilk do. Reasonable inferences require that factual dots be connected by straight, rational lines, whereas speculation uses "random paths of wild improbabilities." *Id*. The Seventh Circuit has echoed the connect-the-dots analogy. *See, e.g., Roger Whitmore's Auto. Servs. v. Lake County, Ill.*, 424 F.3d 659, 669 (7th Cir. 2005) ("This is a classic *post hoc ergo propter hoc* logically fallacy, which might make the grade at the pleading stage. But to defeat summary judgment [plaintiff] must present something by which a jury could connect the dots between the *propter* and the *post*. . ."); *United States v. Waldemer*, 50 F.3d 1379, 1384 (7th Cir. 1995) (a reasonable inference requires a logical and proximate connection from the evidence to the fact sought to be inferred).

If these two examples and analogy didn't fully illustrate the distinction, perhaps this classic cartoon will drive home the point.



"I THINK YOU SHOULD BE MORE EXPLICIT HERE IN STEP TWO."

To sum up, for a factfinder to draw an inference, substantive evidence allowing for a reasonable, logical, and causal connection between the evidence and the inferred fact must exist. And if conflicting evidence exists, the inference must take account of that conflicting evidence. Showing one's work—for example, by connecting the dots of the syllogism with a straight line—is a good way to establish that a reasonable inference was drawn, rather than speculation being afoot.

**Analysis**

Sharky's motion doesn't allow the Court to use logical, straight lines of thought to connect evidence to an inference that the purported ESI ever existed. Instead, the motion relies on a series of illogical leaps. First, one must assume that in responding to Plaintiff's first request for production of documents, Defendants provided some—but not all—responsive text messages. Second, one must believe that Defendants acted to delete these other messages, either by willful destruction or by casual lapse of time, waiting for autodeletion to run its course.[11] Third, one must believe that

[11] Of course, autodeletion doesn't selectively delete messages as Sharky's assumes. *See The Sedona Conference Glossary: eDiscovery & Digital Information Management, Fifth Edition*, 21 Sedona Conf.

Defendants acted in concert—orchestrating a conspiracy amongst themselves, and maybe their lawyers too—to not only hide and delete these messages but also fail to mention any of their relevant (let alone incriminating) material during depositions or otherwise. And fourth, this must all occur *despite* providing detailed accounts of their encounters with Coltrain elsewhere in discovery. In other words, Sharky's asks the Court to believe that because *some* messages *possibly* existed *at some point in time*, this is enough to believe that responsive and incriminating messages existed and were unreasonably destroyed sufficient for curative relief and monetary sanctions. This line of argument falls far short of a preponderance of the evidence required for the Court to draw a reasonable inference to find that additional ESI existed. Instead, Sharkey's asks this Court to speculate. Notably, Sharkey's reply brief fails to adequately address evidence that conflicts with its attempt to connect evidence to the inference that the purported ESI existed.

The only concrete evidence Sharky's can produce demonstrating that there were at one time additional text messages that would have been responsive to its discovery demands are police activity logs—which *were* produced during discovery—indicating text messages were sent between Coltrain and Village Officers. But these messages predate the fire by more than a year and thus predate any reasonable anticipation of litigation, even accepting that date at its earliest possible point in April 2024. *See* Motion for Sanctions at ex. B [284-2] (detailing contacts with Coltrain on November 30, 2022 and January 26, 2023). *See Trask-Morton v. Motel 6 Operating*

J. 263, 272-72 (2020) (defining "auto-delete" as "the use of technology to run predefined rules at schedule intervals to delete or otherwise manage electronically stored information.").

*L.P.*, 534 F.3d 672, 681 (7th Cir. 2008) (duty to preserve arises when a party knows or reasonably knows that litigation is imminent); *Philmar Dairy, LLC v. Armstrong Farms*, No. 18-cv-530, 2019 U.S. Dist. LEXIS 115384, at *8-10 (D.N.M. Jul. 11, 2019) (presence of fire without significant personal injury or death is insufficient to trigger duty to preserve).

Moreover, the two additional contacts with Coltrain made "via phone" also predate the fire and are also consistent with a fully responsive response to production of documents. *Id.* (detailing contacts with Coltrain on January 2, 2024 and February 3, 2024); *see also* Rogers dep. at 34:24-35:6 (detailing that Coltrain would *either* call or text her). Even taking this to its extreme, and even assuming there were text messages at one point that were deleted, it's unreasonable to expect Village police officers in April 2024 to have actively retained text messages documenting Coltrain requesting a third-party be trespassed or independently reporting a fight outside his residence. Other than involving a common party, these encounters with an apparent frequent flyer to the Mt. Morris Police Department and Ogle County Jail have absolutely nothing to do with the facts of the case.

Labash testified that he may have communicated with Cicchetti or Robert Hough, Chief of the Mt. Morris Fire Protection District, about the fire. Defendants produced communications between Labash and Cicchetti. There is no evidence that anything else exists for them to produce.

Contrary to Sharky's position in its motion to supplement, the recent response to the fourth request for documents largely *undercuts* its position that Defendants

are hiding, spoliating, or otherwise playing fast and loose with its discovery obligations. A sequence of approximately four messages and a screenshot detailing Cicchetti's awareness in September 2024 that Coltrain was soliciting donations for a lawsuit against the Village of Mount Morris is not the smoking gun it believes it to be. It's not even reasonably responsive to Sharky's third set of requests for documents, which narrowed its scope to documents relating to (i) ordinance violations at 1 N. Wesley, (ii) Sharky's Sports Bar, or (iii) the fire that occurred on April 16, 2024. Obviously, Sharky's thought something *additional* might not be captured within those three categories, which is why its fourth request was for documents "relating to allegations by Defendant Justin Coltrain that property was removed or stolen from the fire debris following the April 16, 2024 fire." The text messages produced in response to the fourth request are directly responsive to that fourth request, not the third request.

To the extent that these four messages and a screenshot make the first of the necessary assumptions detailed above slightly more likely (i.e., that Defendants have provided some—but not all—responsive text messages), this is plausibly true. But it also makes it even less likely that two other necessary assumptions are true (i.e., that Defendants acted to delete these other messages and are now acting in concert to hide and delete these messages). That these messages existed and were provided in the latest round of responses when specifically sought speaks to full disclosure, not spoilation.

Finally, the existence of these messages on an unknown phone doesn't mean that either Defendants or their counsel were lying when they reported that no text or call logs on the officers' phones in question existed. Ostensibly, these messages came from a new phone altogether—apparently one that doesn't autodelete for at least two years. Counsel searching the Defendant officers' phones without success is not mutually exclusive to another phone in the universe containing these messages that were responsive to the fourth set of requests from Sharky's.

The First Circuit's decision in *Gomez v. Stop & Shop Supermarket Co.* 670 F.3d 395 (1st Cir. 2012) provides excellent guidance when a court is dealing with a speculative assertion that evidence was spoliated. In that case, the plaintiff claimed that because video recordings existed for some areas of the store, there must have been video recordings of *all* of the areas of the store, including the location where the plaintiff slipped and fell. The First Circuit rejected this assertion with this analysis:

> We canvass the pertinent evidence. A cashier employed by the defendant testified that there are cameras in the store that cover 'a good majority' of the selling floor. Although this testimony supports a conclusion that the store had cameras focused on some areas of the market, it does not support the conclusion (or even a reasonable inference) that a security camera filmed the incident that transpired in the greeting card aisle. The absence of any such evidence is fatal to the plaintiff's hypothesis."

*Id.* at 399.

Likewise, in this case, the lack of evidence as to the existence of electronic communications doesn't allow for a reasonable inference that the ESI existed in the first place. So, Plaintiff's Rule 37(e) motion fails at the most rudimentary requirement.

That is not to say that Defendants have exhibited perfect document retention practices. Indeed, their practice is far from it, and at times embarrassingly so. Failing to disable auto-delete functions of likely custodians when litigation is reasonably foreseeable plays with Rule 37(e) fire. *DR Distribs.*, 513 F. Supp. 3d at 979. What's more, the Village's lax-to-non-existent policies regarding the officers' use of personal devices is light years away from best practices. *See* The Sedona Conference, *Commentary on BYOD: Principles and Guidance for Developing Policies and Meeting Discovery Obligations*, 19 Sedona Conf. J. 495, 515 (2018) (Comment 1.c. "Significant legal implications may result if the organization is unable to access its business information on employee-owned devices").[12] This is even more true with the latest disclosures. The Village's practice of allowing officers to use personal cell phones—let alone the failure to enforce a uniform policy related to auto-delete functions on those phones—invites inconsistency and the potential appearance of impropriety, two items which should be avoided by a conscientious police department and town, if possible. *See* Judge Xavier Rodriguez, *Who has "Possession, Custody or Control" of Employee's Personal Mobile Device? Time for Amendments to the Federal Rules*, 30 J. Tech. L & Pol'y 165 (2026) ("As mobile devices become indispensable tools for professional communication, the distinction between personal and business data has blurred—creating critical challenges for litigants and organizations navigating discovery obligations."). But bad record retention practice—particularly predating the

[12] Defendants' lack of protocols also creates a potential Freedom of Information Act minefield. Because the undersigned doesn't get paid anymore to provide this advice to Illinois municipalities, fixing this situation is left for counsel.

anticipation of litigation—doesn't necessarily equate to intentional spoilation of evidence. Bad record retention practice *can* be evidence supporting a finding under Rule 37(e)—both subsections (1) and (2)—but is insufficient when, as in this case, there isn't evidence that the ESI existed in the first place.

Regarding Defendant's motion for attorneys' fees, a motion for relief under Rule 37(e) doesn't provide for a fee-shifting provision for unsuccessful parties. Textually, Defendants provide no statutory or rule basis for the relief it seeks in attorneys' fees. And, in its discretion, the Court doesn't find Sharky's motion to be frivolous, albeit misguided.[13] So, Defendants' request for fees is denied.

**Conclusion**

Sharky's has failed to demonstrate the spoilation of evidence and is not entitled to relief. The motion for sanctions is denied without prejudice. If future discovery or disclosure produces evidence of actual spoilation, as opposed to the mere possibility, it may renew its motion at that time. This action is referred back to Magistrate Judge Schneider. The parties should revisit settlement discussions before spending money on retained opinion witnesses.

Date: August 26, 2026 By: ____________________________

Iain D. Johnston
United States District Judge

[13] This Court has previously commented on the inordinate number of Rule 37(e) motions that have been filed before it. *Groves Inc. v. R.C. Bremer Mktg. Assocs.*, No. 22 CV 50154,2024 U.S. Dist. LEXIS 213009 (N.D. Ill. Nov. 22, 2024). The Court certainly hopes that it hasn't developed a reputation as a sanctioning judge. As evidenced by this order—as well as others in which curative measures and sanctions were denied, *see White v. Powell*, No. 21-cv-50094, 2016 U.S. Dist. LEXIS 88583 (N.D. Ill. Apr. 22, 2026)—the Court analyzes the particular facts of each case and isn't predisposed to enter Rule 37(e) curative measures or sanctions.